IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

BRYAN LEWIS JACKSON,

   Plaintiff,

v.          **Case No.: 2:14-cv-14508**

CAROLYN W. COLVIN,
**Acting Commissioner of the
Social Security Administration,**

   Defendant.

## <u>PROPOSED FINDINGS AND RECOMMENDATIONS</u>

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

The undersigned has thoroughly considered the evidence, the applicable law, and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that the final decision of the Commissioner be **REVERSED;** this matter be **REMANDED** for further proceedings pursuant to sentence four of 42

1

U.S.C. § 405(g); and this action be **DISMISSED, with prejudice,** and removed from the docket of the Court.

## I.    Procedural History

On September 15, 2008, Plaintiff, Bryan Lewis Jackson ("Claimant"), filed an application for DIB, alleging a disability onset date of January 1, 2004, due to "lumbar degenerative disk disease at the L4 L5 S1, post diskectomy, foraminotomy, hemilaminotomy; arthritis; sleep apnea, and depression." (Tr. at 218, 296). His application was denied initially and upon reconsideration. (Tr. at 96). Claimant requested and received a hearing before William R. Paxton, Administrative Law Judge ("ALJ"), who determined on September 14, 2010 that Claimant was not disabled under the Social Security Act. (Tr. at 96-106). Claimant filed a request for review, and on June 13, 2012, the Appeals Council remanded the case to the ALJ for further proceedings. (Tr. at 112-13). Specifically, the Appeals Council instructed the ALJ to give further consideration to Claimant's maximum residual functional capacity; particularly, in light of a disability determination by the Department of Veterans Affairs that found Claimant to be unemployable due to service-connected disabilities. (Tr. at 112).  In addition, the ALJ was ordered to obtain supplemental evidence from a vocational expert, if appropriate. (Tr. at 113).

On September 17, 2013, the ALJ conducted an administrative hearing. (Tr. at 60-90). After considering Claimant's testimony, additional documentation, and the opinions of a vocational expert, the ALJ issued a written decision on October 25, 2013 finding that Claimant was not disabled under the Social Security Act. (Tr. at 10-24). The ALJ's decision became the final decision of the Commissioner on February 21, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1–3).

2

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 5, 6). Claimant submitted a Brief in Support of Judgment on the Pleadings, (ECF No. 7), and Defendant filed a Brief in Support of Defendant's Decision, to which Claimant served a reply memorandum. (ECF Nos. 8, 11). Consequently, the matter is fully briefed and ready for resolution.

## II.   <u>Claimant's Background</u>

Claimant was 44 years old at the time he filed the instant application, and 49 years old when the ALJ issued the 2013 written decision denying benefits. (Tr. at 64, 218). Claimant graduated from high school and served in the United States Army from 1981 through 2003. (Tr. at 64). After leaving military service, Claimant enrolled in college, obtained a Bachelor's Degree, and was one year shy of receiving a Master's Degree at the time of the administrative hearing. (Tr. at 80). Claimant's prior relevant work experience included administration and personnel management, general supervisory tasks, and postal work, all performed in the military. The vocational expert described Claimant's past occupations as skilled sedentary work with a specific vocation preparation skill level range between 6 and 7. (Tr. at 22).

## III.   <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or

4

her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's

residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2008. (Tr. at 12, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity from the date of the alleged onset of disability through his date last insured; that being, January 1, 2004 through December 31, 2008. (Tr. at 13, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "degenerative disc disease of the lumbar spine status post lumbar discectomy, foraminotomy, hemilaminotomy and obstructive sleep apnea." (Tr. at 13-15, Finding No. 3). He considered Claimant's other alleged impairments, but decided that they were either not medically determinable, or they were non-severe. (*Id.*).

With respect to the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 15-16, Finding No. 4). Accordingly, the ALJ determined Claimant's RFC for the relevant period, concluding that he could:

> Perform sedentary work as defined in 20 CFR 404.1567(a) except that he requires a sit/stand option, can sit for 30 minutes at a time, and can stand for 10 minutes at a time; he can never crawl or climb ladders, ropes, or scaffolds; he can occasionally balance, stoop, kneel crouch, and climb ramps and stairs. He must avoid concentrated exposure to extreme heat, extreme cold, vibration, noise, and hazards such as heights and machinery. Additionally, due to symptoms including pain and side effects of medication, the claimant is limited to understanding, remembering, and carrying out simple instructions.

 (Tr. at 16-22, Finding No. 5). At the fourth inquiry, with the assistance of a vocational expert, the ALJ found that Claimant was unable to perform his past relevant work. Although the exertional demands of the prior occupations were sedentary, the ALJ

explained that, when taking into consideration Claimant's limitation to simple tasks, he was unable to meet the skill levels required to perform his past work. (Tr. at 22, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's age, education, and past work experience, in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 22-23, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1964, and was defined as a younger individual on the date he was last insured; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding of "not disabled" regardless of transferability of job skills. (Tr. at 22, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy such as a surveillance system monitor. (Tr. at 22-23, Finding No. 10). Therefore, Claimant was not disabled as defined by the Social Security Act. (Tr. at 23, Finding No. 11).

**IV.**   **Claimant's Challenge to the Commissioner's Decision**

Claimant raises one challenge to the Commissioner's decision. He alleges that the ALJ committed reversible error by failing to give proper weight to a disability determination made by the Department of Veterans Affairs ("VA"). (ECF No. 7 at 8-10). On May 31, 2008, the VA issued a Rating Decision, finding that Claimant had (1) sleep apnea, which was 50% disabling, (2) degenerative disc disease of the lumbar spine status post discectomy, foraminotomy, hemilaminotomy ("DDD"), which was 40% disabling, and (3) tinnitus, which was 10% disabling. (Tr. at 978-82). As a result of these combined service-connected impairments, the VA determined that Claimant

was entitled to individual unemployability, and he was awarded benefits. (Tr. at 982).

Although Claimant submitted the VA's Rating Decision to the ALJ during the first administrative proceedings, the ALJ did not explicitly consider, discuss, or weigh the VA's determination in his written opinion. Accordingly, the Appeals Council remanded the case to the ALJ to reassess Claimant's RFC with a particular focus on the impact of the VA's Rating Decision. In his second written opinion, apparently attempting to satisfy the Appeals Council's directive, the ALJ addressed the VA's disability determination, stating:

> The undersigned has thoroughly considered the Rating Decision by the Department of Veterans Affairs dated May 31, 2008 (Exhibit 3D), as well as the document concerning the claimant's entitlement amount and payment start date for the Department of Veterans Affairs dated June 2, 2008 (Exhibit 4D). These two assessments, as well as the related assessment to Dr. Michels (Exhibit 20F) are considered with the guidelines of SSR 06-3p. The ultimate decision of employability is reserved for the Commissioner. The rating decision gives percentage ratings that do not describe functional limitations. Although considered, the rating decision does not warrant limitations greater than those specified in the current residual functional capacity as specified in finding 5 of this decision. Therefore, the undersigned affords minimal weight to the opinions and ratings found within Exhibits 3D and 4D.

(Tr. at 21). Despite this elucidation of the weight given to the VA's Rating Decision, Claimant once again contends that the ALJ erred in his treatment of the VA's determination. According to Claimant, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") clarified in *Bird v. Commissioner of Soc. Sec.,* 699 F.3d 337 (4th Cir. 2012), that the VA's disability findings are entitled to substantial weight in the Social Security disability determination process unless the evidence in the record clearly supports the assignment of less weight. (ECF No. 7 at 9). Claimant argues that, contrary to this dictate, the ALJ provided no citations to the evidence of

record that justified assigning less than substantial weight to the VA's Rating Decision. Claimant asserts that the ALJ's explanations that employability is an issue reserved to the Commissioner and the VA's percentages of disability do not establish functional limitations simply do not constitute *record findings* that "*clearly demonstrate*" a basis for giving the Rating Decision only minimal weight. Thus, Claimant maintains that the Commissioner's decision must be reversed and remanded for a more thorough assessment of the VA's Rating Decision.

In response, the Commissioner makes three points. First, she asserts that the *Bird* decision "does not categorically require that Social Security's ALJs assign a predetermined amount of weight—"substantial weight"—to the disability rating decisions from the VA in all circumstances." (ECF No. 8 at 13). Instead, if the ALJ indicates that the Rating Decision is entitled to less weight, and the record before the ALJ supports that conclusion, *Bird's* mandate is satisfied. Second, the Commissioner argues that even if the ALJ should have provided a better discussion of the record evidence that justified affording the Rating Decision minimal weight, remand is not appropriate because there is no reason to believe that the ALJ's decision will be any different on a third review. The Commissioner emphasizes that the ALJ was clear in his finding that the VA's Rating Decision was unpersuasive in the face of contradictory medical records and medical source opinions. The ALJ thoroughly discussed the medical evidence and opinions throughout the decision and pointed to the evidence that supported a finding of nondisability. Therefore, in the Commissioner's view, remanding the case would be nothing more than an empty search for procedural perfection and an exercise in futility, neither of which is required by *Bird*, or is useful. (ECF No. 16-18). Lastly, the Commissioner claims that

9

the ALJ's finding of nondisability is supported by substantial evidence and should be affirmed. (Tr. at 18-20). The Commissioner argues that the medical evidence, including the records from the Veterans Administration Medical Center, demonstrate that Claimant is capable of performing sedentary work. The ALJ placed specific work-related limitations on Claimant that were consistent with his impairments, including degenerative disc disease ("DDD") and sleep apnea, and yet still, a vocational expert determined that there were jobs in substantial numbers in the economy that Claimant could perform. Therefore, the Commissioner's final decision should not be disturbed. (*Id.*).

## V.   **Relevant Medical History**

The undersigned has reviewed the evidence in its entirety, including all of the medical records. However, in light of the targeted nature of the challenge, an abbreviated summary of the relevant health care records and opinions follows.

### A.  *The VA Rating Decision and Supporting Records*

Claimant alleges a disability onset date of January 1, 2004. His VA Rating Decision was issued on May 31, 2008 with a grant of individual unemployability effective October 17, 2007. (Tr. at 221-22). Claimant's date last insured for DIB was December 31, 2008. Accordingly, there is no dispute that the Rating Decision is relevant to the time period at issue before the ALJ. Moreover, the Rating Decision focused on three medical conditions—DDD, sleep apnea, and tinnitus—two of which constitute the severe impairments found by the ALJ and which form the basis of the limitations contained in the RFC assessment. Consequently, both agencies looked at the same medical conditions in reaching their disability determinations. However, it should be mentioned that the ALJ reviewed and relied upon treatment records and

evaluations not specifically before the VA. According to the Rating Decision, the VA based its determination of unemployability primarily upon three medical examinations[1] performed at the Veterans Administration Medical Center ("VAMC") in Clarksburg, West Virginia, including two examinations that were performed on November 15, 2007, and one that was performed on April 21, 2008.

### 1. November 15, 2007 examination by Mabel Wright, PA-C

On November 15, 2007**,** Ms. Mabel Wright, a certified Physician's Assistant, evaluated Claimant for increased benefits related to his service-connected disabilities of DDD and sleep apnea, and for his newly-filed claim seeking a designation of unemployability. (Tr. at 635-38). By way of history, Claimant reported that he was first diagnosed with sleep apnea in May or June 2004, but had prior symptoms and was supposed to be scheduled for an evaluation of his sleep disorder in 2003, while on active duty. Claimant used a CPAP machine at night, which was set at a moderate setting. (Tr. at 635). Claimant advised that the CPAP machine helped with his breathing and reduced the number of times he awoke during the middle of the night, although he still experienced fatigue and daytime hypersomnolence.

With regard to his back, Claimant reported having back surgery in 1993. He described currently having chronic back pain that was more left-sided and radiated into the left buttock. Occasionally, the pain spread to his knee or ankle, although not frequently. He did suffer from periodic muscle spasms, stiffness, and low back weakness. Claimant indicated that he used oxycodone 4 times per day and performed

---

[1] The Rating Decision indicates that two separate examinations were performed on April 21, 2008. (Tr. at 222). However, the VAMC Health Summary reflects only one examination on that date and notes that it was a disability examination performed by Mabel Wright, PA-C. (Tr. at 628). Two examinations were performed on November 15, 2007, however. (Tr. at 629). Ms. Wright completed one of them, and the other was performed by an audiologist, Luanne Merritt, M.S., CCC/A. (*Id.*).

stretching exercises to treat the symptoms, and these measures helped some. (Tr. at 636). Claimant complained of having flare-ups about seven times per month, which could be triggered by walking, prolonged sitting, or carrying anything out in front of him. A flare-up usually lasted 1 to 2 days, and the resulting pain caused him to remain in bed until the flare-up passed. Nonetheless, Claimant admitted that he had never been placed on bedrest by a physician due to back pain, and he did not use a cane, crutches, or a walker. (*Id.*). Claimant did use a brace a couple times of month, but tried not to use it more often for fear that he would become dependent on it.

As for activities, Claimant advised that he could perform all activities of daily living. When his back flared-up, these activities took longer to complete, but he could still do them. On good days, he could walk up to 2 miles on a treadmill and on bad days, he could walk no more than 1/2 mile at his own pace. He had been able to drive the sixty minutes to the appointment with Ms. Wright, but complained of some stiffness when he got out of the car. When asked how his back pain and sleep apnea affected his ability to work, Claimant stated that he had last worked approximately one month earlier. He worked one 56-hour week at a mental health facility. He added that the hours were long since part of the time was dedicated to training. Claimant indicated that the work exacerbated his back pain to the extent that he quit after the first week. Claimant also stated that he was taking internet courses to obtain his Master's Degree in rehabilitation counseling. He had previously attended classes in person, but could no longer tolerate sitting in the classroom chairs. Claimant mentioned that his daytime sleepiness posed an additional problem for him, and on days when his back hurt, he was not able to do anything physical that required lifting or bending. Walking requirements could likewise create an obstacle to employment

even on good days. Claimant stated that he worried a great deal about missing work once he got a job. He reported that while on active duty, he missed a lot of work due to his back problems, and he was concerned that employers in the private sector would not tolerate such frequent absences. (Tr. at 637).

Ms. Wright performed a physical examination of Claimant. (*Id.*). She noted that Claimant was in no acute distress. His gait and posture were normal, and he was not using any assistive or walking device. Claimant's straight leg raising test was negative both in the sitting and standing positions; his muscle strength was 5/5 in the right lower extremity and 4/5 in the left lower extremity; and his deep tendon reflexes were 2+ and equal bilaterally. Ms. Wright saw no abnormalities of the spine; no muscle spasms were appreciated; and no tenderness was noted. (*Id.*). Claimant had some loss of motion with range of motion testing, which became more pronounced with repetition. Ms. Wright did not believe any diagnostic testing was needed in view of Claimant's already well-established diagnoses of sleep apnea and DDD. She confirmed those diagnoses. (Tr. at 638).

In summary, Ms. Wright opined that Claimant's reported back limitations would likely prevent him from participating in any physical or sedentary employment. (Tr. at 637). However, she did not believe that Claimant's sleep apnea would preclude employment and suggested that Claimant discuss his CPAP setting with his primary care physician to achieve better relief. (*Id.*).

### 2.  November 15, 2007 examination by Luanne Merritt, M.S.

Ms. Merritt performed an audiology examination of Claimant. (Tr. at 632-34). She recorded his symptoms as "trouble hearing in background noise." Claimant reported a history of bilateral tinnitus, but denied any family history of hearing loss,

ear disease, or head trauma. (Tr. at 633). After testing, Ms. Merritt determined that Claimant had normal hearing to 2khz sloping to a moderate to severe sensorineural hearing loss bilaterally. (Tr. at 634). She wrote, "I was asked to comment on the extent of functional impairment due to the service connected hearing loss and tinnitus and how that impacts physical and sedentary employment. ... His severity of hearing loss does not impact his ability to maintain employment." (Tr. at 634-35).

### 3.  April 21, 2008 examination by Mabel Wright, PA-C

The second evaluation by Ms. Wright focused primarily on Claimant's spinal disorder. This evaluation was scheduled for disability assessment and was co-signed by Dr. Pramoda Devabhaktuni, Staff Physician at the VAMC. (Tr. at 656-64). Claimant reported that he continued to have a significant problem with back pain. (Tr. at 657). At the time, he was experiencing the after-effects of a flare-up that was triggered by moving a load of towels from the washer to the dryer. Claimant stated that to treat his symptoms, he took four Percocet tablets each day, did back stretching exercises, used ice and an adjustable bed, and restricted his activities. Claimant also attended physical therapy sessions two to three times per week. He stated that heat made his pain worse, and he could not use a TENS unit because it caused muscle spasms. Claimant indicated that he had a fair response to treatment. (*Id.*).

Claimant told Ms. Wright that his back was first injured in 1993 when he was rappelling out of a helicopter. He subsequently had surgery. The pain he now suffered was in his lower back to the left of the spine. He described the pain as constant, both sharp and dull, and moderate in severity. The pain radiated down his back and the outside of his leg to his knee and occasionally to his ankle. (Tr. at 658). Claimant reported having weekly flare-ups that caused severe pain and lasted anywhere from

hours to a week. The flare-ups were precipitated by sleeping on his stomach, carrying things in front of him, bending, and weed-eating. Claimant stated that he had incapacitating flare-ups 3 to 4 times each year, and when these occurred, he generally had to stop what he was doing and was "laid up" for 2 to 7 days. (Tr. at 658-59).

Ms. Wright performed an examination of Claimant's spine. She found no weakness, tenderness, spasm, or atrophy of the thoracic sacrospinalis, but observed bilateral guarding and left-sided pain with motion. Ms. Wright commented that Claimant's posture was stooped, his gait was antalgic, and his spine showed lumbar flattening, although it appeared symmetrical. (Tr. at 659-60). A motor examination revealed that Claimant's left hip flexion, left hip extension, and left great toe extension had some decrease in active movement against resistance. (Tr. at 660-61). His left thigh and calf were smaller in size than his right thigh and calf. (Tr. at 661). Claimant's sensation was slightly reduced on the left side, and his left ankle jerk reflex was hypoactive. (Tr. at 661-62). Range of motion testing showed pain with flexion, extension, lateral flexion, and lateral rotation in the thoracolumbar spine segment, and the pain increased with repetition. (Tr. at 662).

Ms. Wright diagnosed Claimant with DDD of the lumbar spine. (Tr. at 663). She noted that this condition prevented Claimant from participating in sports, severely affected his ability to do chores and exercise, moderately affected his ability to shop, travel, bathe, dress, groom and enjoy recreations. Ms. Wright added that Claimant was working on his Master's Degree online, but was having trouble completing the courses due to back pain. Claimant advised her that even when he used a laptop in his adjustable bed with his back and legs elevated, he was able to tolerate the pain only for short periods of time. (Tr. at 664).

### B.  Other Records Discussed by the ALJ

#### 1.  Lumbar Spine-Treatment Records

In addition to the two examinations by Mabel Wright, the ALJ reviewed treatment Claimant received by Michael Shramowiat, M.D., a physical medicine and rehabilitation specialist. (Tr. at 17). On October 23, 2003, Claimant presented to Dr. Shramowiat with complaints of low back pain radiating to the left lower extremity with numbness in both lower extremities. (Tr. at 484). He described the pain as a constant dull ache that varied in intensity and was sometimes a sharp pain. The pain was exacerbated by sitting and standing. Claimant was wearing a lumbosacral corset for support and stated that he felt best when he wore the brace. Dr. Shramowiat noted that Claimant's recent MRI scan revealed a subligamentous disc herniation at L5-S1 and also at L4-5. Claimant took Percocet and ibuprofen for pain, and Nortriptyline for depression. He had not had physical therapy.

On a review of systems, Claimant complained of poor sleep and numbness, loss of hearing with ringing in the ears, high blood pressure, and back, feet and leg pain. (Tr. at 485). A physical examination revealed a weakly positive straight leg raising test on the left side and a 50% reduction in flexion, extension, side bending and rotation. Claimant had fairly severe pain when coming from flexion into neutral position. He also had muscle tightness in the lumbar paravertebral region bilaterally. Dr. Shramowiat diagnosed Claimant with bilateral lumbar radiculopathy and lumbar disc herniation with myelopathy. (*Id.*). He recommended that Claimant begin physical therapy three time per week for four to six weeks; that he start Lortab; that he apply ice to his back twenty minutes per time two times each day; and that he start taking Soma. (Tr. at 485-86). Dr. Shramowiat also suggested that Claimant undergo

an EMG of both lower extremities. The EMG was performed on November 3, 2003 and was interpreted as normal. (Tr. at 487).

Claimant began physical therapy on November 6, 2003. (Tr. at 488-89). By the second week of therapy, Claimant complained of increased back pain so severe that he could not get out of bed. (Tr. at 490). Consequently, the physical therapist obtained approval to try Claimant on aquatic therapy, which Claimant was able to tolerate much better. (*Id.*). On November 25, 2003, Claimant had a second session of aquatic therapy and reported less swelling and pain in his back. (Tr. at 491). He was able to walk with less discomfort, and his gait appeared normal. However, after this session, Claimant missed the next eight appointments. (*Id.*). Accordingly, on December 18, 2003, the physical therapist discharged Claimant from care due to noncompliance. (Tr. at 495).

On March 3, 2005, Claimant began physical therapy with a different therapist. (Tr. at 496-97). Claimant's diagnosis was failed back syndrome, and he was scheduled to be seen two times per week for eight weeks. At this time, Claimant reported that he was a fulltime college student. On April 19, 2005, Claimant was again discharged from care for noncompliance. (Tr. at 501). Apparently, he only appeared for three of six scheduled appointments. Nevertheless, the therapist noted that Claimant reported less symptoms and less reliance on pain medication when in therapy. (*Id.*).

On November 27, 2006, Claimant initiated treatment with Dr. Houman Khosrovi, a neurosurgeon, for evaluation of low back pain radiating into his left lateral thigh and occasionally his ankle. (Tr. at 526). Claimant reported longstanding symptoms, with the pain sometimes rating a ten on a ten-point scale. He stated that he began taking pain medications consistently five years earlier and currently took

17

Percocet, Flexeril, Neurontin, Adalat, and Elavil. He also regularly used a brace. Claimant indicated that he had used a TENS unit in the past, had received physical therapy, and injections. Other than pain, he did not have neurological symptoms such as bowel and bladder dysfunction, or problems with gait or coordination. (*Id.*).

Dr. Khosrovi reviewed an MRI scan from November 1, 2006 that showed surgical changes from Claimant's old surgeries, along with scar tissue formation causing left lateral recess stenosis at L5-S1. Dr. Khosrovi also saw a central disc bulge at L4-L5 with no central canal stenosis or foraminal encroachment. On physical examination, there were no signs suggestive of nerve root dysfunction or myelopathy. Claimant's muscle tone, bulk, and strength were intact and symmetrical. His reflexes were intact, as well, except at the left Achilles tendon, where the reflexes were absent. (*Id.*). Dr. Khosrovi diagnosed Claimant with L4-L5 mild central disc bulge without radiculopathy and left L5-S1 lateral recess stenosis with possible left radiculopathy. Dr. Khosrovi commented that he discussed with Claimant that there was no clear explanation on the MRI scan for Claimant's current symptoms. (Tr. at 526). He did not feel surgical intervention should be considered. Dr. Khosrovi recommended detoxification to wean Claimant from some of his medications, especially Percocet, and wrote: "If after several months of being off these medications he still has pain, then we would be more convinced that this is a chronic pain issue versus rebound pain from trying to come off his narcotics." (*Id.*).

The ALJ also mentioned some records from the VAMC pertinent to Claimant's back problems. (Tr. at 18). He noted that Claimant's evaluations in October and December 2006 were fairly benign, confirming that Claimant was still active and was able to walk without assistive devices. On December 14, 2006, Dr. Joseph Snead, an

orthopedist at the VAMC, observed that Claimant could walk without a limp and was able to stand on his tiptoes and heels normally, meaning that he had no significant neurological muscle weakness in the legs. (Tr. at 639). However, Claimant had loss of motion in the lumbar spine, as well as back and left leg pain. (Tr. at 640). Dr. Snead reviewed a November 1, 2006 MRI film that revealed a significant herniated disc at the L4-L5 that appeared to have made contact with the thecal sac. The ALJ did not mention Dr. Snead's opinion that the residuals of Claimant's original ruptured disc and his current disc rupture would limit Claimant to sedentary or light exertional work and would prevent "heavy lifting, climbing, carrying more than 25 pounds." (*Id*). Dr. Snead added that Claimant was attending school, which was consistent with his limitations, and was getting along alright. In May 2008, November 2008, May 2009, November 2009, and May 2010, Claimant continued to complain of back pain, but had a full range of motion; normal gait and station, and was able to perform all activities of daily living independently. (Tr. at 651, 733, 737, 743, 750, 754, 760).

### 2. Sleep Apnea-Treatment Records

The ALJ mentioned some anecdotal instances in the record where Claimant complained of sleep-related problems. Then, on March 9, 2004, Claimant presented to the office of Dr. Michael Morehead, a neurologist, for an evaluation of his sleep disorder. (Tr. at 504-05). Claimant told Dr. Morehead that the problems with sleep began approximately a year or two earlier and consisted of frequent awakenings after sleep onset with difficulty returning to sleep, gasping, and nocturnal dyspnea. Claimant reported getting about five hours of sleep each night, although he generally went to bed around 11:00 p.m. and arose around 7:00 a.m. He indicated that his sleep was disturbed by back pain, and he seldom felt refreshed in the morning.

Claimant described feeling "lazy" during the day, averaging two 15-30 minute naps. Claimant speculated that some of his daytime grogginess could be due to the narcotics he took for symptomatic relief of back pain. (*Id.*). Dr. Morehead scheduled Claimant for a diagnostic polysomnogram followed by MSLT. (Tr. at 505). These studies revealed an unusual sleep-related breathing pattern characterized by central apneas when in the supine position. (Tr. at 506). Dr. Morehead diagnosed mild sleep apnea, primarily central and positional. He recommended trial of CPAP. (*Id.*).

On June 9, 2004, Dr. Morehead performed additional sleep studies with Claimant using CPAP titration. (Tr. at 509). He determined that Claimant's sleep apnea was controlled with CPAP and recommended a setting of 8 cm. However, Dr. Morehead also determined that Claimant's REM sleep time was reduced. (*Id.*).  On June 29, 2004, Dr. Morehead wrote to Claimant's family physician, Dr. Michael Beane, and advised that Claimant had sleep apnea that was clearly positional, related to supine sleep, and therefore probably had an obstructional component. (Tr. at 511). Dr. Morehead was unable to state to what degree Claimant's pain medication was contributing to the problem, but felt that it could be controlled with CPAP at 8 cm. (*Id.*).

Claimant returned for follow-up on August 17, 2004. (Tr. at 512). He advised Dr. Morehead that he was doing well. He described feeling more refreshed in the morning with less time in bed and believed his concentration was better on CPAP. Claimant also switched pain medication from hydrocodone to Tramadol, and Dr. Morehead speculated that the medication change may also have helped with the sleep disorder. (*Id.*).

### 3.  Opinion Evidence

After reviewing the medical evidence, the ALJ addressed opinion evidence. (Tr. at 20-22). First, he discussed the opinions of two agency consultants, Dr. Fulvio Franyutti and Dr. Uma Reddy, who opined that Claimant was limited to light exertional work with certain postural and environmental restrictions. He gave these opinions "some weight," but found "that the record as a whole supports even more restrictive limitations as described in the above-defined residual functional capacity." (Tr. at 20). In particular, the ALJ found that Claimant was only capable of doing sedentary work and required a sit/stand option.

Next, the ALJ reviewed an opinion submitted by Ronald C. Michels, M.D., one of Claimant's treating physicians at the VAMC in Clarksburg. (Tr. at 20). Dr. Michels completed a Medical Assessment of Ability to Do Work-Related Activities-(Physical) on August 17, 2010. (Tr. at 764-67). He did not indicate that the assessment was specific to the time frame prior to December 31, 2008. Nonetheless, Dr. Michels indicated that Claimant had chronic low back and hip pain that limited his ability to lift and carry objects to ten pounds occasionally; reduced his capacity to stand and walk to two hours out of an eight-hour workday, and no more than 10 minutes without interruption; and allowed him to sit only six hours out of an eight-hour workday, only thirty minutes without interruption. (*Id.*). Dr. Michels's opinions regarding postural, environmental, manipulative, visual, and communicative limitations were no more restrictive than those determined by Drs. Franyutti and Reddy. The ALJ gave Dr. Michels's opinions "great weight," finding them to be well supported by the evidence and to be the opinions of a treating physician.

The ALJ also addressed a second RFC assessment completed by Dr. Michels

on September 16, 2013. (Tr. at 20). For the second assessment, Dr. Michels purportedly based his opinions entirely upon the VA's May 2008 Rating Decision and supporting examination at the VAMC. (Tr. at 975). This assessment was significantly more restrictive than Dr. Michels's 2010 assessment. He found that Claimant could not stand or walk more than 30 minutes in an eight-hour workday, or sit more than two hours. (Tr. at 963-66). Dr. Michels included manipulative limitations for the first time based upon "limited testing on carpal tunnel while on active duty," (Tr. at 965), as well as visual and hearing limitations that were not present on the first evaluation.[2] The ALJ rejected this new assessment outright, indicating that it was inconsistent with the medical evidence and Dr. Michels's own examinations and treatment of Claimant. Notwithstanding Dr. Michels's declaration that the 2013 assessment was based entirely on the VA's Rating Decision, the ALJ considered its date of completion and found the 2013 assessment to be less relevant to the period of disability than Dr. Michels's 2010 assessment. (Tr. at 20).

After finding no merit to Dr. Michels's second RFC assessment, the ALJ examined the Rating Decision and the November 15, 2007 examination by Mabel Wright, PA-C, upon which the Rating Decision was partially based. (Tr. at 21). The ALJ gave the Rating Decision "minimal" weight because it included percentage disability ratings, rather than functional limitations; gave an opinion on employability; and did not "warrant limitations greater than those specified in the current residual functional capacity as specified in finding 5 of this decision." (Tr. at 21).

---

[2] The undersigned notes that Dr. Michels's 2013 RFC assessment form does not appear to be written in his handwriting, although the signature appears to be the same as the signature on his 2010 assessment. (*Compare* Tr. at 764-67 *with* Tr. at 963-66).

With respect to Ms. Wright's opinions, the ALJ gave no weight to Ms. Wright's conclusion that Claimant was unable to perform physical or sedentary employment due to the condition of his lumbar spine. (*Id.*). The ALJ noted that Ms. Wright's qualifications were not clear from the record,[3] nor was her familiarity with Claimant's alleged conditions. Moreover, the ALJ pointed out that Ms. Wright's opinions were on issues reserved to the Commissioner and therefore were not entitled to significant or special weight.

Finally, the ALJ reviewed and considered a Third Party Function Report completed by Claimant's spouse. The ALJ did not find the spouse's report to be credible because of her bias and motivation to assist her husband, her potential financial gain if Claimant was awarded benefits, and the lack of clinical or diagnostic evidence supporting the severity of symptoms described by Claimant's spouse. (Tr. at 21).

## VI.  <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir.

---

[3] The ALJ is correct that Ms. Wright's qualifications are not readily apparent from the November 2007 entry. However, the documentation of the April 21, 2008 disability examination clearly identifies Ms. Wright as a Certified Physician's Assistant.

1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart,* 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock,* 483 F.2d at 775.

## VII.  Discussion

In *Bird v. Commissioner of Soc. Sec.,* the Fourth Circuit discussed the role that disability decisions by other governmental agencies play in the SSA's disability determination process, stating the general rule that while these decisions are not binding on the SSA, they "cannot be ignored and must be considered" when determining a claimant's eligibility for Social Security disability benefits. *Id.,* 699 F.3d at 343 (citing *DeLoatche v. Heckler*, 715 F.2d 148, 150 n. 1 (4th Cir. 1983) and SSR 06-03p, 2006 WL 2329939, at *6 (Aug. 9, 2006)).[4] Similar to the instant action, the claimant in *Bird* was found to be unemployable by the VA and awarded disability

---

[4] SSR 06-03p provides *inter alia*:

> Under sections 221 and 1633 of the Act, only a State agency or the Commissioner can make a determination based on Social Security law that you are blind or disabled. Our regulations at 20 CFR 404.1527(e) and 416.927(e) make clear that the final responsibility for deciding certain issues, such as whether you are disabled, is reserved to the Commissioner (see also SSR 96-5p, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner"). However, we are required to evaluate all the evidence in the case record that may have a bearing on our determination or decision of disability, including decisions by other governmental and nongovernmental agencies (20 CFR 404.1512(b)(5) and 416.912(b)(5)). Therefore, evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered.

benefits, but was determined by an ALJ not to be disabled under the Social Security Act. After the district court affirmed the Commissioner's decision, the claimant argued on appeal that the ALJ had failed to afford adequate weight to the VA's Rating Decision. In considering the argument, the Fourth Circuit acknowledged that while it had not addressed the precise weight that the SSA should give to the VA's disability ratings, sister circuits had found varying degrees of deference to be appropriate. Examining the programs, the Court observed that "both the VA and Social Security programs serve the same governmental purpose of providing benefits to persons unable to work because of a serious disability." *Id.* In addition, "[b]oth programs evaluate a claimant's ability to perform full-time work in the national economy on a sustained and continuing basis; both focus on analyzing a claimant's functional limitations; and both require claimants to present extensive medical documentation in support of their claims." *Id.* (citing *McCartey v. Massanari,* 298 F.3d 1072, 1076 (9th Cir. 2002)). Consequently, the Court found that "because the purpose and evaluation methodology of both programs are closely related, a disability rating by one of the two agencies is highly relevant to the disability determination of the other agency." *Id.* Thus, the Court held:

> [I]n making a disability determination, the SSA must give substantial weight to a VA disability rating. However, because the SSA employs its own standards for evaluating a claimant's alleged disability, and because the effective date of coverage for a claimant's disability under the two programs likely will vary, an ALJ may give less weight to a VA disability rating when the record before the ALJ clearly demonstrates that such a deviation is appropriate.

*Id.* Since the *Bird* decision, many courts in this circuit have concluded that a finding of nondisability by the Commissioner must be reversed and remanded when the ALJ failed to give substantial weight to a relevant VA Rating Decision, or in the

alternative, failed to explain how giving the rating less weight was clearly appropriate in light of the record. *See, e.g., Williams v. Colvin,* No. 5:13-CV-571-FL, 2015 WL 73954, at *3 (E.D.N.C. Jan 6, 2015); *Wyche v. Colvin,* No. 4:13-cv-43, 2014 WL 1903106, at *8 n. 2, *10 (E.D.Va. Apr. 30, 2014) (collecting cases); *Sheldon v. Colvin,* No. 9:13-cv-0151 DCN, 2014 WL 1364984, at *4 (D.S.C. Apr. 7, 2014); *Gross v. Commissioner of Soc. Sec.,* No. WDQ-13-1274, 2014 WL 3672878, at *4 (D.Md. July 22, 2014); *Salazar v. Colvin,* No. 1:10-cv-972, 2014 WL 486726, at *6 (M.D.N.C. Feb. 6, 2014). In some instances, remand was necessary simply because the evidence was not weighed in accordance with *Bird*, and weighing the evidence is not the Court's function. Accordingly, the case was remanded so that the evidence could be reweighed by the ALJ using the correct evidentiary standard. *Sheldon,* 2014 WL 1364984, at *4.

In this case, the ALJ's first decision was remanded by the Commissioner because the ALJ failed to assess and weigh the VA's Rating Decision. On the second attempt, the ALJ did analyze the VA's disability determination and explicitly weighed it, but did not acknowledge the *Bird*-imposed presumption that VA disability determinations are entitled to substantial weight unless the record clearly demonstrates that a deviation is appropriate. Even more importantly, the ALJ did not provide a proper or sufficient explanation for the diminished value he attributed to the VA's Rating Decision.

The ALJ gave three reasons for affording the Rating Decision "minimal" weight. First, he found the VA's determination to be unpersuasive because "[t]he ultimate decision of employability is reserved for the Commissioner." (Tr. at 21). While the ALJ correctly stated Social Security law, that statement did not constitute

*evidence* from the record clearly justifying a deviation from the "substantial weight" presumption. Second, the ALJ observed that "[t]he rating decision gives percentage ratings that do not describe functional limitations." (*Id.*). Once again, the ALJ's observation is accurate; however, as Claimant points out in his reply memorandum, accepting that explanation as an adequate basis to devalue the worth of the VA's decision "would essentially negate the Fourth Circuit's holding in *Bird*, in that every VA rating decision is couched in language that gives a percentage rating." (ECF No. 11 at 1). This observation does not constitute *record evidence* clearly demonstrating a reason to deviate from the substantial weight presumption. Furthermore, with this statement, the ALJ actually provides a misleading, or uninformed, interpretation of the available evidence. Claimant's treating physician, Dr. Michels, prepared an RFC assessment containing functional limitations that he explicitly based upon the findings in the VA's Rating Decision; accordingly, the translation from percentage disability into corresponding functional effects was performed by a VAMC physician and submitted to the ALJ prior to his decision. (Tr. at 975, 983-86). Third, the ALJ concluded that "the rating decision does not warrant limitations greater than those specified in the current residual functional capacity as specified in finding 5 of this decision." (Tr. at 21). Notwithstanding the certainty with which the ALJ made this pronouncement, he never specifically pointed to any *evidence* in the record that clearly supported his decision to deviate from the substantial weight presumption. Thus, the ALJ erred in his treatment of the VA's Rating Decision.

The Commissioner contends that even if the ALJ erred by not providing a better explanation for his decision to deviate, the case should not be remanded because the error was harmless. (ECF No. 8 at 17). According to the Commissioner,

the Court should not search for procedural perfection. Where, as here, substantial evidence supports the ALJ's conclusion of nondisability, remanding the matter is of "no practical utility." (*Id.*).

While in principle, the undersigned agrees with the Commissioner's view of the harmless error doctrine in Social Security cases, her argument simply is not persuasive under the facts of the instant action. An ALJ's error is harmless when it does not substantively prejudice the claimant. *See Mascio v. Colvin,* 780 F.3d 632, 639 (4th Cir. 2015) (finding that an ALJ's error in assessing a claimant's credibility after, instead of before, determining his RFC would be harmless so long as the ALJ conducted a proper credibility assessment); *Tanner v. Comm'r of Soc. Sec.,* No. 14–1272, –––F.Appx. –––, –––, 2015 WL 574222, at *5 (4th Cir.  Feb. 12, 2015) (finding an ALJ's error to be harmless where it was "highly unlikely, given the medical evidence of record, that a remand to the agency would change the Commissioner's finding of nondisability"); *Austin v. Astrue,* No. 7:06–CV–00622, 2007 WL 3070601, *6 (W.D.Va. Oct. 18, 2007) ("[E]rrors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error") (citing *Camp v. Massanari,* 22 F. App'x 311 (4th Cir.2001)). In order for a reviewing court to find an error harmless, the court must be able to plainly see from the ALJ's written decision that the prejudicial effect of the ALJ's mistake was, in some way, remedied, so that a final determination of nondisability is indeed supported by substantial evidence. As the court pointed out in *Wyche v. Colvin*, "[t]he Fourth Circuit has now made it clear that the ALJ must give the VA's disability determination 'substantial weight.' If the opinion does not, then it must be evident from the opinion itself why the ALJ departed from that standard. '[A] court may not

guess at what an agency meant to say, but must instead restrict itself to what the agency actually did say.'" *Id.,* No. 4:13cv43, 2014 WL 1903106, at \*10 (E.D.Va. April 30, 2014). Unfortunately, here, the ALJ provided no specific evidentiary reasons for deviating from the presumption that a VA's disability determination is entitled to substantial weight. Therefore, the Court would have to speculate as to what evidence in the record the ALJ felt clearly demonstrated that a deviation was warranted. In addition, it is not entirely clear that the ALJ appreciated that the April 2008 VAMC evaluation conducted by Ms. Wright and counter-signed by Dr. Devabhaktuni was performed for the purpose of assessing Claimant's unemployability and therefore should have been carefully examined and more fully addressed. The ALJ apparently did not appreciate that Ms. Wright's credentials were set forth in the April 2008 notation, and he made no mention of Ms. Wright's opinions regarding the extent to which Claimant's back pain and dysfunction affected his ability to perform everyday tasks like shopping, bathing, dressing, exercise, grooming, and doing chores. (Tr. at 663). If the ALJ truly gave the April 2008 examination a thorough review, it is hard to understand how he missed Ms. Wright's credentials. Likewise, given the ALJ's criticism that the Rating Decision did not include a functional assessment, the fact that he overlooked the functional evaluation performed by Ms. Wright in April 2008 suggests that the ALJ did not give adequate attention to the April examination or the Rating Decision. For that reason, the undersigned **FINDS** that the ALJ's error cannot be seen as harmless and the Commissioner's decision is not supported by substantial evidence. *See Gross v. Commissioner of Soc. Sec.,* Case No. WDQ-13-1274, 2014 WL 3672878, \*3-4 (D.Md. July 22, 2014) (finding that despite a remand order, the ALJ

gave "short shrift" to the VA's Rating Decision by not clearly demonstrating what evidence in the record justified affording it minimal weight).

This finding is not meant to imply that the Claimant has established disability under the Social Security Act. Indeed, the ALJ's RFC finding ultimately may be sustained when the evidence pertinent to the Rating Decision is reviewed and reweighed applying the correct legal standards. However, the procedural and evidentiary requirements set forth in *Bird* are integral parts of the agency's sequential evaluation of disability claims, and must be followed during the determination process to ensure that the weight afforded to various pieces of evidence reflects proper consideration. The Court simply cannot come behind the agency and perform tasks that are not within the scope of the Court's review authority.

## VIII. <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the United States District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings pursuant to *Bird v. Commissioner of Soc. Sec*; and **DISMISS** this action, with prejudice, from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days

(mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** May 4, 2015

Cheryl A. Eifert
United States Magistrate Judge